**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| XR COMMUNICATIONS, LLC, dba VIVATO TECHNOLOGIES,<br><br>Plaintiff,<br>v.<br>TARGET CORPORATION,<br>Defendant. | Case No. 2:26-cv-01048<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 *et seq.*, in which Plaintiff XR Communications LLC d/b/a Vivato Technologies ("Plaintiff" or "Vivato") makes the following allegations against Defendant Target Corporation ("Defendant" or "Target"):

## INTRODUCTION

1. This complaint arises from Defendant's unlawful infringement of United States Patent No. 8,289,939 (the "'939 Patent" or the "Asserted Patent"), which generally relates to wireless communication technology and, in particular, to coordinating signal transmission and reception among multiple wireless access points. Target sells, offers to sell, and uses Wi-Fi 7 wireless routers and mesh Wi-Fi systems that practice the '939 Patent, both in its many retail stores (including stores in this District) and through its www.target.com website and mobile applications. Target's own product page for one of those routers tells its customers that the router is "[p]owered by Wi-Fi 7 technology, such as Multi-Link Operation," the very Wi-Fi 7 functionality that practices the '939 Patent.

2. Countless electronic devices today connect to the Internet wirelessly. Beyond just connecting our devices together, wireless networks have become an inseparable part of our lives in our homes, our offices, and our neighborhood coffee shops. In even our most crowded spaces, today's wireless technology allows all of us to communicate with each other, on our own devices, at virtually the same time. Our connected world would be unrecognizable without the ubiquity of sophisticated wireless networking technology.

3. Just a few decades ago, wireless technology of this kind could only be found in science fiction. The underlying science behind wireless communications can be traced back to the development of "wireless telegraphy" in the nineteenth century. Guglielmo Marconi is credited with developing the first practical radio, and in 1896, Guglielmo Marconi was awarded British patent 12039, Improvements in transmitting electrical impulses and signals and in apparatus therefor, the first patent to issue for a Herzian wave-based wireless telegraphic system. Marconi would go on to win the Nobel Prize in Physics in 1909 for his contributions to the field.

4. One of Marconi's preeminent contemporaries was Dr. Karl Ferdinand Braun, who shared the 1909 Nobel Prize in Physics with Marconi. In his Nobel lecture dated December 11, 1909, Braun explained that he was inspired to work on wireless technology by Marconi's own experiments. Braun had observed that the signal strength in Marconi's radio was limited beyond a certain distance, and wondered why increasing the voltage on Marconi's radio did not result in a stronger transmission at greater distances. Braun thus dedicated himself to developing wireless devices with a stronger, more effective transmission capability.

5. In 1905, Braun invented the first phased array antenna. This phased array antenna featured three antennas carefully positioned relative to one another with a specific phase relationship so that the radio waves output from each antenna could add together to increase

radiation in a desired direction. This design allowed Braun's phased array antenna to transmit a directed signal.

6. Building on the fundamental breakthrough that radio transmissions can be *directed* according to a specific radiation pattern through the use of a phased array antenna, directed wireless communication technology has developed many applications over the years. Braun's invention led to further developments in radar, smart antennas, and, eventually, to a technology known as "MIMO," or "multiple-input, multiple-output," which would ultimately allow a single radio channel to receive and transmit multiple data signals simultaneously. Along the way, engineers have worked tirelessly to overcome limitations and roadblocks directed wireless communication technology.

7. At the beginning of the twenty-first century, the vast majority of wireless networks still did not yet take advantage of directed wireless communications. Instead, "omnidirectional" access points and base stations were ubiquitous. Omnidirectional base stations transmit radio waves uniformly around the base station in every direction and do not steer the signal in particular directions. Omnidirectional antenna base stations do typically achieve 360 degrees of coverage around the base station, but with a reduced coverage distance. Omnidirectional base stations also lack sophisticated approaches to overcome certain types of interference in the environment. As only one example, the presence of solid obstructions, such as a building, can limit signal penetration. As another example, interference arises when radio waves are reflected, refracted, or diffracted based on obstacles present between the transmitter and receiver. The multiple paths that radio waves can travel between the transmitter and receiver often result in signal interference that decreases performance, and omnidirectional base stations lack advanced solutions to overcome these "multipath" effects.

8. Moving from omnidirectional networks to modern networks has required an additional series of advancements that harness the capabilities of directed wireless technology. These advancements range from conceiving various ways to steer and modify radiation patterns, to enhancing the transmission signal power in a desired direction, to suppressing radiation in undesired directions, to minimizing signal "noise," and then applying these new approaches into communications networks with multiple, heterogenous transmitters and receivers.

9. Harnessing the capabilities of directed wireless technology resulted in a significant leap forward in the signal strength, reliability, concurrent users, and/or data transmission capability of a wireless network. One of the fundamental building blocks of this latest transition was the development of improvements to MIMO and "beamforming," and to the coordination of transmission and reception among multiple access points, which are the subject matter of the patent in this infringement action that resulted from the investment of tens of millions of dollars and years of tireless effort by a group of engineers who built a technology company slightly ahead of its time. Their patented innovations laid the groundwork for today's networks, including the Wi-Fi 7 products that Target sells, and are infringed by Defendant.

## THE PARTIES

10. Plaintiff XR Communications, LLC, d/b/a Vivato Technologies ("Vivato" or "Plaintiff") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 2802 Wildcreek Ct., Keller, TX 76248. Vivato is the sole owner by assignment of all right, title, and interest in the Asserted Patent.

11. Vivato was founded in 2000 as an $80+ million venture-backed company with several key innovators in the wireless communication field including Siavash Alamouti, Ken Biba, William Crilly, James Brennan, Edward Casas, and Vahid Tarokh, among many others. At that

time, “Wi-Fi” or “802.11” had become the prominent means of wireless connection to the Internet, integrated into hundreds of millions of mobile devices globally. Vivato was founded to leverage its talent to generate intellectual property and deliver Wi-Fi/802.11 wireless connectivity solutions to service the growing demand for bandwidth.

12. Vivato has accomplished significant innovations in the field of wireless communications technology. One area of focus at Vivato was the development of advanced wireless systems with sophisticated antenna designs to improve wireless speed, coverage, and reliability. Vivato also focused on designing wireless systems that maximize the efficient use of spectrum and wireless resources for large numbers of connected mobile devices. Ultimately, Vivato’s accomplishments expanded beyond “Wi-Fi” and “802.11”-based networks.

13. Vivato’s inventions and technology, particularly relating to “MIMO” and beamforming, also apply to wireless communication apart from WiFi, such as communication using cellular networks. Indeed, Vivato’s earliest products focused on achieving wireless communication over much longer ranges (i.e., several miles) as compared to a traditional 802.11 Wi-Fi access point.

14. Among many fundamental breakthroughs achieved by Vivato are inventions that allow for intelligent and adaptive beamforming based on up-to-date information about the wireless medium, as well as adaptive beamforming in larger base stations accommodating many beams and many users. Through these and many other inventions, Vivato’s engineers pioneered a wireless technology that provides for simultaneous transmission and reception, a significant leap forward over conventional wireless technology.

15. Over the years, Vivato has developed proven technology, with over 400 deployments globally, including private, public and government, and it has become a recognized

provider of extended range wireless network infrastructure solutions. Vivato's wireless base stations integrate beamforming phased array antenna design with packet steering technology to deliver high-bandwidth extended range connections to serve multiple users and multiple devices.

16. Vivato’s patent portfolio includes over 17 issued patents and pending patent applications. The patented technology at issue in this case is directed to specific aspects of wireless communication, including the coordination of signal transmission and reception among a plurality of wireless access points.

17. On information and belief, Defendant Target Corporation is a corporation organized and existing under the laws of the State of Minnesota, with its principal place of business at 1000 Nicollet Mall, Minneapolis, Minnesota 55403. On information and belief, Target is registered to do business in Texas and may be served through its registered agent for service in Texas, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

18. Target operates 1,995 retail stores in the United States, including 159 stores in Texas, together with the www.target.com website and the Target mobile applications, and as of January 31, 2026 it employed approximately 415,000 people. *See* https://www.sec.gov/Archives/edgar/data/27419/000002741926000016/tgt-20260131.htm. Target reports that its “strategy continues to leverage stores as fulfillment hubs, with stores fulfilling more than 97 percent of total Merchandise Sales in each of the last three years,” and that its “stores fulfill the majority of digitally originated sales, including shipment from stores to guests, store Order Pickup or Drive Up, and Same-Day Delivery.” *Id.* Target provides consumer electronics products, including the Accused Products described below, to customers throughout the State of Texas, including in the Eastern District of Texas.

**JURISDICTION AND VENUE**

19. This action arises under the patent laws of the United States, Title 35 of the United States Code § 1, et seq, including 35 U.S.C. §§ 271, 281, 283, 284, and 285. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

20. This Court has personal jurisdiction over Defendant in this action because Defendant has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over it would not offend traditional notions of fair play and substantial justice. Defendant, directly and through agents or intermediaries, has committed and continues to commit acts of infringement in this District by, among other things, using, offering to sell, selling, and importing products that infringe the Asserted Patent, and by inducing and contributing to the infringement of the Asserted Patent, in this District. Defendant is, directly and through intermediaries, using, selling, offering for sale, distributing, advertising, promoting, and otherwise commercializing the Accused Products in this District, including through the Target retail stores located in this District and through sales made on www.target.com or through its mobile applications to customers in this District. Defendant regularly conducts and solicits business in, engages in other persistent courses of conduct in, and derives substantial revenue from goods and services provided to the residents of this District and the State of Texas. Defendant is subject to jurisdiction pursuant to due process and/or the Texas Long Arm Statute due to its substantial business in this State and District including at least its infringing activities, regularly doing or soliciting business at its Texas facilities, and engaging in persistent conduct and deriving substantial revenues from goods and services provided to residents in the State of Texas including the Eastern District of Texas.

21. Defendant, directly and/or through intermediaries, has purposefully and voluntarily placed one or more products and/or services in the stream of commerce that practice the Asserted

Patent with the intention and expectation that they will be purchased and used by consumers in the Eastern District of Texas. These products and/or services have been and continue to be purchased and used in the Eastern District of Texas.

22. Venue is proper in this District under 28 U.S.C. § 1400(b) because Defendant has committed acts of infringement in this District and has a regular and established place of business in this District, as set forth below. On information and belief, Defendant is registered to do business in Texas, has transacted business in this District, and has committed acts of direct and indirect infringement in this District by, among other things, using, offering to sell, selling, and importing products that infringe the Asserted Patent.

23. Target owns or leases, operates, staffs, and conducts business from numerous Target retail stores in this District, including stores located at 7003 S. Broadway Avenue, Tyler, Texas 75703; 3092 N. Eastman Road, Longview, Texas 75605; 102 Richmond Ranch Road, Texarkana, Texas 75503; 4160 Town Center Road, Sherman, Texas 75092; 5850 Eastex Freeway, Beaumont, Texas 77708; 3100 Highway 365, Suite 90, Port Arthur, Texas 77642; 4200 S. Medford Drive, Lufkin, Texas 75901; 120 W. Parker Road, Plano, Texas 75075; 2200 Dallas Parkway, Plano, Texas 75093; 3201 Preston Road, Frisco, Texas 75034; 4885 Eldorado Parkway, Frisco, Texas 75033; 2025 N. Central Expressway, McKinney, Texas 75070; 8900 State Highway 121, McKinney, Texas 75070; 907 W. McDermott Drive, Allen, Texas 75013; 150 E. Stacy Road, Allen, Texas 75002; 401 Gates Parkway, Prosper, Texas 75078; 3440 W. FM 544, Wylie, Texas 75098; 1801 S. Loop 288, Denton, Texas 76205; 2755 W. University Drive, Suite 1101, Denton, Texas 76201; 4760 State Highway 121, Lewisville, Texas 75056; and 5959 Long Prairie Road, Flower Mound, Texas 75028. *See* https://www.target.com/store-locator/store-directory/texas; *see, e.g.*, https://www.target.com/sl/tyler/775; https://www.target.com/sl/longview/2283. Each of these

stores is a physical, permanent retail location in this District from which Target, through its employees, regularly sells and offers to sell consumer electronics, including the Accused Products, to the public, and at which Target's customers pick up and return products ordered on www.target.com. For example, as of November 13, 2026, Target's website reported the Archer BE3600 Wi-Fi 7 router identified below as "In stock" and "Ready within 2 hours for pickup inside the store" at Target stores in this District including its Tyler, Longview, Plano, Plano West, Allen, Frisco, Frisco North, McKinney SW, Wylie, and Lewisville State Highway 121 stores. Each of these stores is therefore a regular and established place of business of Target, and Target has committed acts of infringement including sales and offers for sale of the Accused Products at them.

24. Target has also committed acts of infringement in this District by selling and offering to sell the Accused Products to customers in this District through www.target.com and the Target mobile applications, including orders shipped to addresses in this District and orders fulfilled through Target's Order Pickup, Drive Up, and Same-Day Delivery programs at the Target stores in this District identified above. For example, on November 13 and November 17, 2026, Target's website offered to ship Acer, Cudy, and TP-Link Accused Products identified below to Marshall, Texas (ZIP code 75670).

25. In another recent patent infringement action in this District, Target answered without contesting that this federal judicial district is a proper venue for a patent infringement action against it, and it admitted that it has stores in this District. *See* Answer ¶¶ 21, 31, *Headwater Research LLC v. Walmart Inc.*, No. 2:25-cv-00961-JRG-RSP (E.D. Tex. Nov. 26, 2025), Dkt. No. 55 ("Target does not contest, solely for the purposes of the present action, whether venue over them properly lies in this District.").

**TARGET'S INFRINGING WI-FI 7 PRODUCTS AND SERVICES**

26. "Wi-Fi 7" is the designation for wireless networking products that implement the IEEE 802.11be amendment to the IEEE 802.11 standard. The Wi-Fi Alliance introduced its Wi-Fi CERTIFIED 7 certification program in 2024. Wi-Fi 7 introduced several new features, including Multi-Link Operation ("MLO"), 320 MHz channels in the 6 GHz band, 4K quadrature amplitude modulation ("4K QAM"), Multiple Resource Units ("Multi-RU"), and preamble (or spectrum) puncturing. *See* https://www.wi-fi.org/discover-wi-fi/wi-fi-certified-7.

27. With MLO, a Wi-Fi 7 access point and a Wi-Fi 7 client device can associate and simultaneously exchange traffic on multiple bands or channels (for example, the 2.4 GHz, 5 GHz, and 6 GHz bands) and the access point coordinates the traffic among those links, including by steering traffic from one link to another, switching links dynamically based on channel conditions, and restraining transmission on one link while another link is being used to receive. MLO "is a mandatory feature for Wi-Fi 7 certification." *See* https://documentation.meraki.com/MR/Wi-Fi_Basics_and_Best_Practices/Wi-Fi_7_(802.11be)_Technical_Guide; https://blogs.cisco.com/networking/wi-fi-7s-multi-link-operation-mlo-dissection-from-packets-to-performance. For example, in the Enhanced Multi-Link Single Radio ("EMLSR") mode of MLO that many Wi-Fi 7 client devices implement, the client listens on multiple links at once and, depending on the transmit opportunity available on a given link, dynamically switches its radio chains to that link to exchange data, while the access point refrains from transmitting to that client on the other link. Preamble puncturing, likewise a mandatory feature for Wi-Fi 7 certification, allows an access point to "carve out" a portion of a channel that is experiencing interference and to continue transmitting on the remainder of the channel. *Id.*

28. The '939 Patent claims, among other things, an apparatus comprising a wireless input/output unit that is configured to establish a plurality of access points, together with signal

transmission/reception coordination logic that monitors those access points for received signals and, upon ascertaining that a first access point is receiving a first signal on a first channel, restrains a second access point from transmitting a second signal on a second, different channel. Wi-Fi 7 routers, mesh systems, and range extenders that implement MLO practice these claims: each establishes a plurality of access points (for example, the 2.4 GHz, 5 GHz, and 6 GHz links of an access-point multi-link device, or the multiple nodes of a Wi-Fi 7 mesh system), monitors those access points for received signals, and restrains transmission on one link or node on one channel while another link or node is receiving on a different channel, as detailed in Exhibit 2.

29. Target sells, offers to sell, and uses Wi-Fi 7 wireless routers, mesh Wi-Fi systems, access points, gateways, and range extenders that support MLO (collectively, the "Accused Products"), in its retail stores and through www.target.com and the Target mobile applications. The Accused Products include, by way of example and without limitation, the TP-Link Archer BE3600 dual-band Wi-Fi 7 router, which Target lists as the "Archer BE3600 Pro" (Target TCIN 94720901; DPCI 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) and sells from its own inventory in its stores and on www.target.com. The Accused Products also include, by way of example and without limitation, the following Wi-Fi 7 products that Target offers for sale on www.target.com and in the Target mobile applications through its "Target Plus" marketplace: the Acer Predator Connect T7 (BE11000) tri-band mesh Wi-Fi 7 router (TCIN 1010341800); the Cudy WR11000 (BE11000) tri-band Wi-Fi 7 router (TCIN 1012198430); the Cudy WR6500H (BE6500) dual-band Wi-Fi 7 router (TCIN 1012198450); and the following TP-Link Wi-Fi 7 products, each of which Target lists as "Manufacturer Refurbished": the Archer BE11000 Pro tri-band router (TCIN 1012257396); the Archer BE260 (BE5000), Archer BE4800, Archer BE230 (BE3600), and Archer BE3200 dual-band routers (TCINs 1013516892, 1014804437, 1012104010, and 1014993737); the Deco

BE16000 quad-band mesh system (TCIN 1013563385); the Deco BE65-Outdoor (BE11000) tri-band outdoor mesh unit (TCIN 1014799275); the Festa F76 (BE11000) tri-band access point (TCIN 1015156188); and the RE405BE (BE6500) and RE223BE (BE3200) dual-band range extenders (TCINs 1012181675 and 1012181401); together with all other Wi-Fi 7 routers, mesh systems, access points, gateways, and range extenders supporting MLO that Target has made, used, sold, offered for sale, or imported, other than any product expressly licensed under the '939 Patent. On information and belief, Target has also offered for sale through Target Plus the manufacturer-refurbished TP-Link RE235BE (BE3600) dual-band Wi-Fi 7 range extender (TCIN 1012181539), which Target's website listed at a stated price but showed as out of stock on November 17, 2026.

30. Target markets the Accused Products specifically as "Wi-Fi 7" products and describes, in its own product pages, the Multi-Link Operation functionality that practices the '939 Patent. Target's product page for the Archer BE3600, which Target labels a "Bestseller," states: "Powered by Wi-Fi 7 technology, such as Multi-Link Operation, 4K-QAM, Multi-RU, Archer BE3600 delivers an incredible wireless rate of up to 3.6 Gbps, enabling your devices to run at full speed." *See* https://www.target.com/p/tp-link-archer-be3600-dual-band-mesh-wi-fi-7-router-smart-app-38-wpa3-security/-/A-94720901. The specifications on that page identify the router's "Wireless Technology" as "Wi-Fi 7 (IEEE 802.11be)." *Id.* Target's product page for the Acer Predator Connect T7 states that "Multi-Link Operation lets compatible devices transmit across several bands at once," and that "additional Predator Connect units can be added to build a seamless mesh with no dead zones." *See* https://www.target.com/p/acer-predator-connect-t7-wi-fi-7-mesh-router-be11000-tri-band-gaming-router/-/A-1010341800. Target's product page for the Archer BE11000 Pro states that "Multi-Link Operation (MLO) enables Archer BE11000 Pro to

transmit data with Wi-Fi 7 clients across the 6 GHz, 5 GHz and 2.4 GHz bands simultaneously." *See* https://www.target.com/p/refurbished-tp-link-archer-be11000-tri-band-wi-fi-7-router-black-manufacturer-refurbished/-/A-1012257396. Target's product page for the Cudy WR11000 describes it as a "Tri-Band Wi-Fi 7 BE11000 Router" with "cutting-edge Wi-Fi 7 technology" and "Cudy Mesh support." *See* https://www.target.com/p/cudy-tri-band-wi-fi-7-be11000-router-6-stream-10-gbps-4-2-5g-ports-up-to-11000mbps-vpn-app-6-high-gain-antennas/-/A-1012198430. Target's product page for the Cudy WR6500H describes it as a "Wi-Fi 7 (802.11be) router" that "can transfer up to 6453 Mb/s over the 2.4 and 5 GHz bands" and advertises "Cudy Mesh support." *See* https://www.target.com/p/cudy-be6500-wifi-7-router-dual-band-gaming-router-2-5g-wan-port-6500mbps-vpn-cudy-app-black/-/A-1012198450. Target's product pages for the other refurbished TP-Link products make similar statements. Target's page for the Archer BE260 states that "Multi-Link Operation (MLO) allows you to simultaneously connect to devices with multiple bands for high throughput, reduced latency, and improved reliability"; its page for the Archer BE230 states that "WiFi 7's Multi-Link Operation keeps your devices connected to multiple channels at once, boosting speed and reliability"; its page for the Festa F76 advertises "[f]eatures such as Multi-Link Operation (MLO), 4K-QAM, and Multi-RUs"; its page for the Deco BE16000 advertises "the latest WiFi 7 MLO technology"; and its page for the RE405BE advertises "support for Wi-Fi 7 features like MLO." *See* https://www.target.com/p/-/A-1013516892; https://www.target.com/p/-/A-1012104010; https://www.target.com/p/-/A-1015156188; https://www.target.com/p/-/A-1013563385; https://www.target.com/p/-/A-1012181675. TP-Link's own product pages for the Archer BE4800, the Archer BE3200, the Deco BE65-Outdoor, and the RE223BE, which Target's pages describe as Wi-Fi 7 products, each list "Multi-Link Operation (MLO)" among the product's features. *See* https://www.tp-link.com/us/home-

networking/wifi-router/archer-be4800/; https://www.tp-link.com/us/home-networking/wifi-router/archer-be3200/; https://www.tp-link.com/us/deco-mesh-wifi/product-family/deco-be65-outdoor/; https://www.tp-link.com/us/home-networking/range-extender/re223be/. Target distributes user guides, quick-start guides, and setup applications with each Accused Product it sells; Target's product page for the Archer BE3600, for example, promotes "Easy Setup with Tether App." *See also* https://www.tp-link.com/us/home-networking/wifi-router/archer-be3600/ ("Multi-Link Operation": "Higher speed, lower latency, more reliable."); https://www.acer.com/us-en/predator/networking/wi-fi/predator-connect-t7-wifi-7-mesh-router ("By aggregating multiple channels across various bands at once, Wi-Fi 7 significantly cuts down latency and boosts reliability"); https://www.cudy.com/products/wr6500h-1-0 ("MLO Speeds": "6453 Mbps").

31. Target itself offers the Acer, Cudy, and refurbished TP-Link Accused Products identified above for sale on www.target.com and in the Target mobile applications through what it calls "Target Plus." Target lists those products under the Target name alongside the products it sells from its own inventory, displays their prices and descriptions, offers protection plans for them, and accepts customers' orders for them through Target's own shopping cart. On each of those product pages, Target quotes a delivery date to the customer's ZIP code and invites the customer to buy the product at the stated price through Target's "Add to cart" button. Target's page for the Cudy WR6500H, for example, lists the router at "$129.99," offers to "Ship to 75670" (Marshall, Texas) with a stated arrival date, and offers with it a "2 Year Electronics Protection Plan," "Free & easy returns" by mail or "in store," and a discount to "Save 5% every day" with Target's "Target Circle™ Card." *See* https://www.target.com/p/cudy-be6500-wifi-7-router-dual-band-gaming-router-2-5g-wan-port-6500mbps-vpn-cudy-app-black/-/A-1012198450. Target tells

its customers that a Target Plus Partner "sells and ships items directly to you through Target.com and the Target apps," that "Target curates these Partners," and that "Target processes payment for items purchased from these Partners." *See* https://www.target.com/sp/acer/-/N-10023101; https://www.target.com/sp/saphiant-enterprises-llc/-/N-10036714; https://www.target.com/sp/ideal-sales/-/N-10016940. Target's Terms & Conditions likewise state that "Target will process your payment for items sold by Target Plus Partners, and Target will handle any payment-related disputes, refunds, credits, and adjustments," and that "[i]tems sold by Target Plus Partners can be returned to Target, subject to the Target Plus Partner's Return Policy." *See* https://www.target.com/c/terms-conditions/-/N-4sr7l. Target also tells its customers that "Target Plus purchases must be returned to Target online or in-store," and that the Acer Predator Connect T7, for example, "can be returned to any Target store or Target.com." *See* https://www.target.com/sp/acer/-/N-10023101; https://www.target.com/p/acer-predator-connect-t7-wi-fi-7-mesh-router-be11000-tri-band-gaming-router/-/A-1010341800. In its annual report, Target describes Target Plus as "our third-party digital marketplace," states that its digital channels include "a complementary assortment sold by Target and third parties through our Target Plus digital marketplace," and reports revenue from "commissions earned on third-party sales" through that marketplace. *See* https://www.sec.gov/Archives/edgar/data/27419/000002741926000016/tgt-20260131.htm. Target therefore itself offers to sell those Accused Products. On information and belief, Target also sells them, and at a minimum Target actively induces and contributes to their infringing sale and use.

32. Target also supports its customers' purchase and use of the Accused Products. Target offers a "2 Year Electronics Protection Plan" on its product pages for Accused Products, and it accepts returns of the Accused Products, including Accused Products sold through Target

Plus, at its stores. On information and belief, Target further uses the Accused Products in the United States, including by inspecting, testing, and demonstrating them and by processing returned units.

33. Under Target's model, customers may buy the Accused Products in a store, online for shipment to their homes, or online for store pickup or same-day delivery, such that Target's infringing sales of the Accused Products occur in its stores and through www.target.com throughout the United States, including in this District.

## COUNT I

## INFRINGEMENT OF U.S. PATENT NO. 8,289,939

34. Vivato realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

35. Vivato owns by assignment all rights, title, and interest in U.S. Patent No. 8,289,939, entitled "Signal Communication Coordination." The '939 Patent was duly and legally issued by the United States Patent and Trademark Office on October 16, 2012. A true and correct copy of the '939 Patent is attached as Exhibit 1.

36. Defendant has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '939 Patent, including at least claim 30, in violation of 35 U.S.C. § 271(a), by making, using, offering to sell, selling, and/or importing into the United States the Accused Products without authorization. Specifically, on information and belief, Target has sold, offered to sell, and used the Accused Products in its stores throughout the United States, including the stores in this District identified above, and has sold and offered to sell the Accused Products through www.target.com and the Target mobile applications, including Accused Products listed through Target Plus, to customers throughout the United States, including

customers in Texas and in this District. Each of the Accused Products is an apparatus that satisfies the ’939 Patent, including at least every limitation of claim 30, as shown in Exhibit 2. Defendant is liable for infringement of the ’939 Patent pursuant to 35 U.S.C. § 271(a).

37. The Accused Products satisfy all claim limitations of at least claim 30 of the ’939 Patent. Claim charts comparing independent claim 30 of the ’939 Patent (together with dependent claims 33-35 and claims 15, 17) to representative Accused Products are attached as Exhibit 2. Exhibit 2 identifies the Wi-Fi 7 functionality, including Multi-Link Operation, dynamic link switching, and preamble puncturing, by which each Accused Product satisfies each limitation of those claims, and Vivato provides it without the benefit of discovery into the Accused Products.

38. Defendant has had actual knowledge of the ’939 Patent, and of its infringement of the ’939 Patent, at least as of the filing and service of this Complaint, which attaches the ’939 Patent (Exhibit 1) and a detailed claim chart (Exhibit 2) that identifies the Accused Products and maps each limitation of at least claim 30 of the ’939 Patent to the specific Wi-Fi 7 functionality of those products. Defendant therefore knows that the ’939 Patent exists and which of the products it sells infringe, which claims they infringe, and how the Accused Products meet each limitation of those claims.

39. Defendant knowingly and intentionally induces infringement of one or more claims of the ’939 Patent, including at least claim 30, in violation of 35 U.S.C. § 271(b). Despite its knowledge of the ’939 Patent, Defendant continues to actively encourage and instruct its customers and end users to use the Accused Products in ways that directly infringe the ’939 Patent including by installing and operating them as Wi-Fi 7 routers, access points, and mesh systems with Multi-Link Operation enabled. Among other things, Defendant continues to sell and offer to sell the Accused Products; to advertise and promote, in its own product descriptions on www.target.com

and in its stores, their Wi-Fi 7, Multi-Link Operation, and mesh capabilities, including by telling customers that the Archer BE3600 is "[p]owered by Wi-Fi 7 technology, such as Multi-Link Operation"; to list, promote, and process sales of Accused Products through Target Plus; and to distribute with each Accused Product the user guides, quick-start guides, and setup applications that direct customers to install and operate the product as a Wi-Fi 7 router or mesh system. On information and belief, Defendant has not modified the Accused Products, their marketing, or their instructions to steer customers toward any non-infringing alternative. Defendant does so knowing and intending that its customers and end users will commit these infringing acts, and knowing or being willfully blind to the fact that the acts it induces infringe the '939 Patent. Accordingly, Defendant specifically intends for others including its customers and end users to directly infringe one or more claims of the '939 Patent in the United States, and it is a reasonable inference that Defendant specifically intended to induce that infringement because Defendant had knowledge of the '939 Patent and actively induced others to directly infringe it.

40. Defendant also contributorily infringes one or more claims of the '939 Patent, including at least claim 30, in violation of 35 U.S.C. § 271(c). Defendant sells and offers to sell within the United States, and/or imports into the United States, the Accused Products, including individual Wi-Fi 7 routers and mesh nodes that customers combine with additional nodes and extenders to form and use the claimed apparatus, knowing that they constitute a material part of the invention claimed in the '939 Patent and that they are especially made and especially adapted for use in infringing the '939 Patent. The Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing use: they are purpose-built Wi-Fi 7 devices whose Wi-Fi 7 radios and multi-link coordination logic are designed, certified, marketed, and sold to establish and coordinate multiple Wi-Fi links in the manner claimed. And that functionality has

no substantial use other than the infringing one. That the Accused Products may also perform other, separable functions such as wired Ethernet switching does not make them staple articles. Defendant has known of the ’939 Patent, and has known that the Accused Products are especially made and especially adapted for use in infringing it, at least since the filing and service of this Complaint, and it nonetheless continues to sell and offer to sell the Accused Products.

41. Defendant’s continued sale, offer for sale, use, and importation of the Accused Products after receiving notice of the ’939 Patent and of the specific infringement identified in Exhibit 2 is knowing, deliberate, and intentional or at a minimum, in reckless disregard of Vivato’s patent rights, and it constitutes willful infringement of the ’939 Patent. Vivato is therefore entitled to enhanced damages under 35 U.S.C. § 284 for Defendant’s infringement of the ’939 Patent, and to a finding that this case is exceptional under 35 U.S.C. § 285.

42. By making, using, offering for sale, selling and/or importing into the United States the Accused Products, and by inducing and contributing to the infringement of others, Defendant has injured Vivato and is liable for infringement of the ’939 Patent pursuant to 35 U.S.C. § 271.

43. As a result of Defendant’s infringement of the ’939 Patent, Vivato is entitled to monetary damages in an amount adequate to compensate for Defendant’s infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendant, together with interest and costs as fixed by the Court.

44. The asserted claims of Vivato’s ’939 Patent are valid, enforceable, and directed to patent-eligible subject matter.

45. Defendant has had actual notice of the ’939 Patent and of its infringement since at least the filing and service of this Complaint, which constitutes notice under 35 U.S.C. § 287(a). Vivato seeks damages for infringement before that date to the extent permitted by 35 U.S.C. § 287.

## PRAYER FOR RELIEF

WHEREFORE, Vivato respectfully requests that this Court enter:

a. A judgment in favor of Vivato that Defendant has infringed, directly and indirectly, either literally and/or under the doctrine of equivalents, the ’939 Patent, and that the asserted claims of the ’939 Patent are valid, enforceable, and patent-eligible;

b. A judgment and order requiring Defendant to pay Vivato its damages, costs, expenses, and pre-judgment and post-judgment interest for Defendant’s infringement of the ’939 Patent, in an amount no less than a reasonable royalty;

c. A judgment and order requiring Defendant to provide an accounting and to pay supplemental damages to Vivato, including without limitation, pre-judgment and post-judgment interest, and an award of an ongoing royalty for Defendant’s post-judgment infringement in an amount according to proof;

d. A judgment that Defendant’s infringement of the ’939 Patent has been willful, and an award of enhanced damages pursuant to 35 U.S.C. § 284;

e. A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Vivato its reasonable attorneys’ fees and costs against Defendant;

f. Any and all injunctive and/or equitable relief to which Vivato may be entitled including without limitation ongoing royalties with respect to Defendant’s infringement; and

g. Any and all other relief as the Court may deem appropriate and just under the circumstances.

## DEMAND FOR JURY TRIAL

Vivato, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of

any issues so triable by right.

Dated: November 19, 2026

Respectfully submitted,

*/s/ Reza Mirzaie*

Reza Mirzaie (CA SBN 246953)
rmirzaie@raklaw.com
Paul A. Kroeger (CA SBN 229074)
pkroeger@raklaw.com
Philip X. Wang (CA SBN 262239)
pwang@raklaw.com
James N. Pickens (CA SBN 307474)
jpickens@raklaw.com
Ryan K. Lundquist (CO Bar No. 56449)
rlundquist@raklaw.com
Adam Hoffman
ahoffman@raklaw.com
Jacob Buczko
jbuczko@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Phone: (310) 826-7474

***Attorneys for Plaintiff XR Communications LLC dba Vivato Technologies***